***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Chapman and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. The Full Commission affirms with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matter of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter.
2. All parties have been correctly designated and there is no question as to the misjoinder or non-joinder of parties.
3. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
4. At all relevant times, an employment relationship existed between the parties.
5. Clarendon National Insurance Company is the carrier on the risk, with Midlands Claims Administrators as the Third Party Administrator.
6. The following documents were stipulated into evidence:
 a. Packet of employment records and medical records and reports indexed as Exhibits A through G
 b. Packet of records from the Division of Vocational Rehabilitation Services
c. Payment records for temporary total disability
 d. Packet of Industrial Commission forms submitted after the hearing
 ***********
Defendants were given thirty days to show cause to the Deputy Commissioner why sanctions should not be assessed for their failure to file a Form 60. Defendants indicated that the failure to file a Form 60 was an inadvertent admission, however, defendants never submitted the form.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was fifty-three years old at the time of the Deputy Commissioner's hearing and is a high school graduate. Plaintiff began working for defendant-employer in January 1997 as a long distance truck driver. Plaintiff and her husband, Warren Queen, were hired together to work as a team and they shared job duties. Besides driving the truck to assigned destinations to pick up and deliver freight, plaintiff and her husband were also required to drop and hook trailers, back up to loading docks, open the doors of the trailer at the loading dock, fuel the truck and occasionally put up load bars. Plaintiff and her husband were not required to load or unload freight.
2. In 1998 and 1999, plaintiff underwent surgery for bilateral carpal tunnel syndrome and recovered well. In 2002, plaintiff began to experience pain, numbness and tingling in her hands and wrists. In her job for defendant-employer, plaintiff used her hands to hold a vibrating steering wheel for long periods of time, change gears, crank the trailer supports up and down, and connect and disconnect pins and hoses. The job duties began to bother plaintiff's hands and wrists and she reported the problem to defendant-employer. Defendant-employer sent plaintiff to Prime Care, where she was referred to Dr. John Graves, an orthopedic surgeon.
3. On November 14, 2002, Dr. Graves examined plaintiff and diagnosed her with probable bilateral carpal tunnel syndrome, left greater than right. He prescribed medication, ordered nerve testing and restricted her from commercial driving. The nerve conduction tests indicated early carpal tunnel syndrome on the left but produced normal readings on the right. On December 23, 2002, Dr. Graves injected plaintiff's left wrist with a Cortisone solution. Plaintiff's symptoms persisted despite treatment and caused a significant impairment. On January 31, 2003, Dr. Graves performed a revision carpal tunnel surgery on plaintiff's left wrist. During the operation, Dr. Graves found extensive synovial proliferation and tenosynovitis.
4. On March 7, 2002, plaintiff presented for an evaluation of her left carpal tunnel release and for evaluation of her right carpal tunnel. Plaintiff's right side showed a positive Phalen's and Tinel's sign, and Dr. Graves discussed treatment options with plaintiff. On March 28, 2003, Dr. Graves performed a right carpal tunnel release and flexor tenosynovectomy. Dr. Graves found significant synovitis around the flexor tendons and a fairly compressed median nerve. After a recovery period that included physical therapy, Dr. Graves released plaintiff to return to regular-duty truck driving as of June 8, 2003. Dr. Graves provided plaintiff with splints to wear while driving, as well as Vioxx to help with inflammation.
5. On June 19, 2003, plaintiff returned to work, but experienced significant pain and numbness in her hands after resuming her job duties. On July 1, 2003, Dr. Graves took plaintiff out of work until she could undergo repeat nerve tests. On July 21, 2003, Dr. Graves informed plaintiff that the EMG studies were within normal limits and he prescribed Neurontin for her neuropathic pain. Dr. Graves had no further treatment options to offer plaintiff, gave her a five percent permanent partial impairment rating of both upper extremities, and referred her to Dr. Albert Bartko, physical medicine and rehabilitation specialist.
6. On August 8, 2003, Dr. Bartko examined plaintiff and felt she might be experiencing referred myofascial pain, so he sent plaintiff to a work hardening program. On September 3, 2003, plaintiff reported improvement in her symptoms and thought that she could return to work if she limited herself to just driving a truck. Dr. Bartko released plaintiff to return to team driving, with her husband performing the physically demanding tasks.
7. As of September 8, 2003, plaintiff returned to work as a team driver with her husband, who dropped and hooked trailers and performed fueling while they were on the road. Mr. Queen also drove the truck more than plaintiff.
8. In October 2003, defendant-employer Highway Express was bought by Celadon Trucking Services, which expanded the service area to include the west coast. In early February 2004, Gary Holmes, Jr., dispatcher, assigned plaintiff and Mr. Queen to drive to California, which was farther than Mr. Queen was willing to drive. Mr. Holmes told plaintiff that if Mr. Queen was not going to California, he should take his gear out of the truck once he returned home. Plaintiff and Mr. Queen did not drive to California.
9. On February 9, 2004, plaintiff and Mr. Queen delivered a load to Greensboro. Mr. Queen informed terminal manager David Bush that he would not take further trips due to the issue of west coast travel. Plaintiff asked Mr. Bush if there were any other drivers she could ride with that could drop and hook and fuel, but Mr. Bush informed her that there were none. In addition, plaintiff and Mr. Queen were hired as a team and defendant-employer had a policy not to match team drivers. Plaintiff did not resign and did not object to driving to California. Because her husband was no longer working for defendant-employer and there was no one else with whom she could team, plaintiff stopped working for defendant-employer after February 12, 2004.
10. Plaintiff contacted the State Division of Vocational Rehabilitation Services to request assistance in finding suitable employment. In June 2005, plaintiff also made an inquiry to defendant-employer about available work; however, no work was available within her restrictions.
11. Although defendants failed to file a Form 60, defendants admitted liability for workers' compensation benefits and paid plaintiff compensation for the time she was out of work in 2002 and 2003, and paid for her medical treatment. Compensation was terminated after plaintiff returned to work in September 2003. Plaintiff returned the checks sent to her after she resumed working. Defendants alleged that they overpaid compensation to plaintiff for temporary total disability, but the competent evidence of record does not support the allegation.
12. When plaintiff returned to work in September 2003, she was under restrictions from Dr. Bartko. Although she could drive the truck, she was restricted from performing the physically demanding tasks normally required of a truck driver. Plaintiff was able to work within the restrictions because her husband was her partner and he was willing to do the harder work and drive more than half of the time.
13. Once Mr. Queen separated from his employment with defendant-employer, defendant-employer could no longer provide suitable light-duty work for plaintiff. Mr. Queen sought employment from a company that did not use team drivers, so plaintiff did not have the option of working for Mr. Queen's new employer.
14. Vocational rehabilitation case manager Lee Eric Anzaldi conducted a labor survey dated December 16, 2004. Mr. Anzaldi's survey revealed that six trucking companies in the Greensboro area hired no-touch freight drivers and were willing to provide "lumpers," who would perform the physical demands of loading and unloading the truck. Mr. Anzaldi also suggested that a dispatcher position could be suitable for plaintiff, given her background and restrictions. On April 13, 2005, plaintiff met with vocational rehabilitation, which identified dispatching as a job she could perform with her experience. At the time of the Deputy Commissioner's hearing, plaintiff had not applied for any dispatching jobs with any employers. Plaintiff has not been employed since February 12, 2004.
15. Although Dr. Graves rated and released plaintiff from his care on July 21, 2003, she had not reached maximum medical improvement. Plaintiff's hands continued to improve until September 2003, when she was able to return to work. Plaintiff reached maximum medical improvement on September 3, 2003 when Dr. Bartko released her to return to work. Plaintiff returned to work for defendant-employer, with her husband performing a large share of her job duties. On February 12, 2004 when her husband was separated from defendant-employer, plaintiff was also separated from the employment. Since then, plaintiff has failed to make a reasonable effort to find suitable work within her restrictions.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Having paid compensation to plaintiff for more than ninety days without contesting liability, defendants admitted that plaintiff sustained a compensable occupational disease. N.C. Gen. Stat. § 97-18.
2. In order to meet the burden of proving continuing disability, plaintiff must prove that she was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that she is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that she is capable of some work, but that she has, after a reasonable effort, been unsuccessful in her efforts to obtain employment; (3) evidence that she is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that she has obtained other employment at wages less than her pre-injury wages. Demery v.Perdue Farms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001);Russell v. Lowes Product Distribution, 108 N.C. App. 762,425 S.E.2d 454 (1993). When a plaintiff meets her burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations. Demery v.Perdue Farms, Inc., supra.
3. In the present case, plaintiff reached maximum medical improvement and was released to return to work on September 3, 2003. Plaintiff did not meet her burden to prove that after her separation from defendant-employer on February 12, 2004, she was unable to obtain other employment after a reasonable effort or that it was futile for her to seek employment because of other factors. She was capable of some work and no doctor took her out of work. N.C. Gen. Stat. § 97-29; Russell v. Lowes ProductDistribution, supra.
4. As the result of the compensable occupational disease to both her left and right extremities, plaintiff is entitled to permanent partial disability compensation at the rate of $539.06 per week for a total of twenty weeks for the five percent rating to each hand. N.C. Gen. Stat. § 97-31(12).
5. Plaintiff is entitled to payment by defendants of all reasonably necessary medical expenses incurred by plaintiff for treatment of her occupational disease, so long as said treatment effects a cure, gives relief, or tends to lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19), 97-25.
6. In that defendants failed to file a Form 60 or Form 63 admitting liability for this claim, they did not comply with the Workers' Compensation Act or Industrial Commission rules and are subject to sanctions. Sanctions in the amount of $1,200.00 are assessed since defendants did not file the form even after being notified of the omission at the Deputy Commissioner's hearing. N.C. Gen. Stat. § 97-18 (b); Rules 103 and 802, Workers' Compensation Rules of the North Carolina Industrial Commission.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law, the Full Commission enters the following:
 AWARD
1. Defendants shall pay plaintiff $539.06 per week for a total of twenty weeks for the five percent rating to each hand. Any compensation that has accrued shall be paid in a lump sum and is subject to the attorney's fee approved below.
2. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff as a result of the compensable occupational disease, for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, or give relief or tend to lessen plaintiff's period of disability.
3. A reasonable attorney's fee of 25% of the compensation awarded plaintiff in paragraph 1 of this Award is hereby approved for plaintiff's counsel and shall be deducted from sums due plaintiff and paid directly to plaintiff's counsel.
4. Defendants shall pay sanctions in the amount of $1,200.00 to the Industrial Commission.
5. Defendants shall pay the costs.
This 14th day of November, 2005.
 S/_________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/_________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_________________ DIANNE C. SELLERS COMMISSIONER